IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

   v.

WILLIAM ANTHONY SMITH,

          Defendant.

Case No.
Hon.

Complaint for Injunctive Relief
Pursuant to 18 U.S.C. § 1345

**Filed Under Seal**

## **Verified Complaint**

Plaintiff, the United States, by and through Dawn N. Ison, United States Attorney for the Eastern District of Michigan, and the undersigned Assistant United States Attorneys, alleges as follows:

## I.    **Nature of the Action**

1.    Defendant William A. Smith ("Smith" or "Defendant") is charged by criminal complaint in this District with defrauding the Detroit Riverfront Conservancy ("Conservancy") of approximately $40 million dollars, including $5 million dollars obtained from Citizens Bank based upon false and fraudulent pretenses, representations, and promises, all in violation of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud). Criminal Case No. 24-mc-30217. Now—as detailed in Sections VI(A) and (B) below—he is actively moving and

dissipating assets, including assets likely gained by his fraud and money laundering.  Plaintiff brings this action for a temporary restraining order, preliminary and permanent injunctions and other equitable relief, to enjoin the Defendant, his brokers, agents, employees and entities owned or controlled by Defendant from alienation and disposition of property or assets derived from the commission of the offenses or of equivalent value, for the purpose of preventing a continuing and substantial injury to the victims thereof, and preserving said assets for forfeiture, fines, and restitution.

## II.   Jurisdiction and Venue

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1345, and 18 U.S.C. § 1345.

3.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b).

## III.   Parties

4.     Plaintiff is the United States of America ("United States").

5.     The Defendant, William Anthony Smith, is a resident of Northville, Michigan.  He served as the Chief Financial Officer of the Conservancy from 2011 until May 10, 2024, when he was placed on paid leave. On May 17, 2024, SMITH

2

was placed on unpaid leave. On May 31, 2024, the Conservancy terminated

Smith's employment.

### IV.    The Anti-Fraud Injunction Statute

6.     The Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, authorizes the

Attorney General to file a civil action to enjoin three types of criminal activity:  (1)

mail, wire, and other fraud prescribed in 18 U.S.C. Pt. I, Ch. 63, as well as false

claims, false statements, and conspiracy under 18 U.S.C. §§ 287, 371, and 1001;

(2) banking law violations as defined in 18 U.S.C. § 3322(d); and (3) federal health

care offenses.  18 U.S.C. § 1345(a)(1).

7.     In the case of banking law violations, the Fraud Injunction Statute also

authorizes the Attorney General to commence a civil action in any federal court if

a person is alienating or disposing of property, or intends to alienate or dispose of

property obtained as a result of, or which is traceable to, a banking law violation.

18 U.S.C. § 1345(a)(2).

8.     Also in the case of banking law violations, the relief available to the

United States includes: (i) an injunction preventing the alienation or disposition of

property obtained as a result of, or which is traceable to, such violation; (ii) a

restraining order prohibiting any person from withdrawing, transferring, removing,

3

dissipating, or disposing of any such property or property of equivalent value; and

(iii) the appointment of a receiver to administer the restraining order.

9.     "Banking law violations" as defined in 18 U.S.C. § 3322(d) includes

violations of and conspiracies to violate 18 U.S.C. § 1344 (bank fraud), and 18

U.S.C. § 1343 (wire fraud affecting a financial institution), and 18 U.S.C. §§ 1956

and 1957 (money laundering).

10.     In any case under 18 U.S.C. § 1345, including cases of non-banking

law violations, the relief available to the United States is a restraining order or

injunction of the fraudulent conduct, or such other action, "as is warranted to

prevent a continuing and substantial injury to the United States or to any person or

class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b).

### V.     <u>Related Legal Framework</u>

11.     A central dimension of the "continuing and substantial injury"

Congress sought to prevent via 18 U.S.C. § 1345(b) and (a)(2) is a fraudster/money

launderer's efforts to make it more difficult or impossible for the victims and the

United States to obtain their legal rights to restitution and forfeiture.  Those

rights—though not limited to restitution and forfeiture—are substantial, and they

suffer each time Smith hides, sells, and spends another asset.

4

12.    Federal forfeiture statutes 18 U.S.C. §§ 981 and 982, together with 28 U.S.C. § 2461, provide that any property that constitutes proceeds, whether direct or indirect, or property traceable thereto, in violation of 18 U.S.C. §§ 1343, 1344, 1956, and 1957, or any property traceable to such property, shall be subject to forfeiture to the United States, and no property right shall exist in it.  All right, title, and interest in such property vests in the United States upon the commission of the act(s) giving rise to forfeiture.  *See e.g.* 21 U.S.C. § 853(c).

13.    Federal forfeiture statutes 18 U.S.C. §§ 981 and 982 also provide that any property involved in a transaction, or attempted transaction in violation of 18 U.S.C. §§ 1956, and 1957, or any property traceable to such property, shall be subject to forfeiture to the United States, and no property right shall exist in it. All right, title, and interest in such property vests in the United States upon the commission of the act(s) giving rise to forfeiture.  *See e.g.* 21 U.S.C. § 853(c).

14.    In the event of conviction, the United States in appropriate circumstances is entitled to a forfeiture money judgment in the amount of a Defendant's total forfeiture liability.  *United States v. Bradley*, 969 F.3d 585, 588 (6th Cir. 2020).  And under 21 U.S.C. § 853(p), in appropriate circumstances where tainted property is no longer available, the United States may forfeit "any

5

other property of the defendant, up to the value of any [tainted] property[.]"

15.    Furthermore, a restitution order is mandatory in the amount of the victims' actual loss in the event of Smith's conviction.  *See e.g.* 18 U.S.C. § 3663A *et seq*; 18 U.S.C. § 3664 (Mandatory Victims Restitution Act ("MVRA")).

16.    A lien under the MVRA arises automatically at the time of judgment and attaches to "all property and rights to property" of the debtor. *See* 18 U.S.C. § 3613(c).  This includes a debtor's equitable or beneficial interests in property even though legal title may be in the name of a nominee or alter ego.  *United States v. Frank*, 8 F.4th 320, 322 (4th Cir. 2021); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350–51 (1977) ("rights to property" can include assets held by a debtor's nominee or alter ego); *Lemaster v. United States,* 891 F.2d 115, 119 (6th Cir.1989) (same); *see also United States v. Wilson*, Case No. 14-13831, 2016 WL 3198629, at *17-18 (E.D. Mich. June 9, 2016).

17.    Courts have held that even pre-indictment, a defendant should reasonably believe "he [is] incurring debts beyond his ability to pay when he defrauded [the victim] and the government of millions of dollars." *United States v. Loftis*, 607 F.3d 173, 177-178 (5th Cir. 2010) (citing *United States v. Resnick*, 594 F.3d 562, 567 (7th Cir. 2010) (same); *see also* 28 U.S.C. § 3002(3)(B) (defining

"debt" to include money owed to the government on account of restitution)).

## VI.   **Factual Allegations**

A. Underlying Wire and Bank Fraud

18.   Smith was employed as the Chief Financial Officer of the Detroit Riverfront Conservancy from 2011 until May 2024 when he was placed on leave[1]. Beginning as early as November 2012 and continuing until his suspension, Smith embezzled funds belonging to the Detroit Riverfront Conservancy, falsified documents to conceal his theft from the Conservancy's Board and Conservancy employees, and fraudulently obtained a $5 million line of credit from a financial institution secured by the Conservancy's pledged donations after Smith's embezzlement threatened to exhaust the Conservancy's cash reserves. Smith used the embezzled funds for his own personal gain and enrichment, spending the funds on airline tickets, hotels, limousines, household goods, lawn care, clothing, and jewelry.

---

[1] On May 31, 2024 the Detroit Riverfront Conservancy terminated Smith's employment for cause.

*Background*

19.    The Conservancy is a 501(c)(3) organization formed with the mission of developing access to the Detroit International Riverfront. The entire vision is 5 ½ miles of Riverfront property, from the Ambassador Bridge to Gabriel Richard Park, just east of the Belle Isle Bridge, and will include the construction of a continuous RiverWalk along with plazas, pavilions and green spaces.[2] The Conservancy is funded by a combination of public and private funds. In 2018, the Ralph C. Wilson, Jr. Foundation gave a $40 million grant to the Conservancy.[3] The Conservancy has also received federal grants through the Environmental Protection Agency as well as state funding. In 2020, the EPA signed a $2.5 million agreement with the Conservancy to remediate contaminated sediment and create a new habitat along the Ralph C. Wilson, Jr. Centennial Park funded through the Great Lakes Legacy Act.[4]

_____

[2] https://detroitriverfront.org/our-story

[3] https://www.dailydetroit.com/50-million-gift-from-the-ralph-c-wilson-jr-foundation-will-transform-west-riverfront-park/

[4] https://www.epa.gov/newsreleases/epa-announces-25-million-plan-advance-cleanup-detroit-river-area-concern

20.     Comerica Bank and Citizens Bank are financial institutions as defined by 18 U.S.C. § 20 and maintained that status throughout all time periods relevant to this complaint.

21.     Smith was hired by the Detroit Riverfront Conservancy as senior director of finance in 2006. He was promoted to the Chief Financial Officer (CFO) in 2011.[5]  Smith was a finalist for the Crain's CFO of the Year Award in 2013. Smith also served on the board of directors for Develop Detroit, a non-profit company that specializes in affordable and mixed-income housing.[6]

22.     In his position as CFO, Smith had sole access and control over the Conservancy's business checking account at Comerica Bank ending in digits 0923. He also had access to and control of the Conservancy's accounts at Citizens Bank.

23.     Smith has established many other business entities in the State of Michigan. Two of his businesses have been directly involved in disbursements

---

[5] https://www.crainsdetroit.com/article/20130526/AWARDS03/305269989/william-smith

[6] https://www.developdetroit.org/our-mission

9

from the Conservancy's Comerica account ending -0923. Those entities are The Joseph Group & Associates LLC and William Smith & Associates LLC.

24.     State of Michigan Department of Licensing and Regulatory Affairs (LARA) records show that The Joseph Group & Associates LLC was organized by Smith and another individual in October 2012. The articles of organization showed that the business purpose or activity was "marketing." Smith is listed as the registered agent. The address shown was 33006 Seven Mile Road Suite 192 in Livonia, Michigan.

25.     LARA records show that Smith formed William Smith & Associates LLC in 2001. The address shown was 33006 Seven Mile Road Number 172 in Livonia, Michigan. No annual statements were filed between October 2017 and March 2022. On April 18, 2022, SMITH filed annual statements for 2018 through 2022 along with a certificate of restoration of good standing.

*American Express Activity*

26.     On May 16, 2024, MSP officers executed a state search warrant of Smith's office at the Conservancy, taking many but not all documents and records located therein. On May 31, 2024, FBI agents executed a subsequent search warrant of Smith's office at the Conservancy, in order to secure the remaining

10

material in the office. His office has been kept locked since he was placed on leave, including during the time between the MSP and FBI searches. A large stack of dated American Express monthly statements located in Smith's office at the Conservancy showed that a Business Platinum Card account ending -0-87001 was opened in the name W A Smith and Assoc / WILLIAM A. SMITH.  The mailing address on the statements was 33006 7 Mile Rd # 172 Livonia Michigan – the same address shown on the LARA filings for William Smith & Associates LLC. The statements indicated that four American Express cards were issued on the account, including to Smith and his wife and other family members. The Conservancy did not maintain any American Express Corporate Cards and had no relationship to this account.

27.     Comerica Bank statements showed that on November 5, 2012 there was an Amex Epayment ACH payment from the Conservancy's account ending in -0923 in the amount of $89,339.43. On November 30, 2012, there was a second Amex payment of $47,231.21.

28.     The February 2013 American Express statement shows an online payment to Smith's AmEx account on February 2, 2013 in the amount of $60,330.55. Bank statements obtained from Comerica showed that an Amex

Epayment ACH payment in the same amount was posted to the Conservancy's checking account ending -0923 two days later. FBI review of Smith's AmEx statements showed that in January 2013 Smith had purchased airline tickets for himself and others, paid insurance premiums, and made significant purchases of clothing and jewelry. For example, on January 3, 2013, Smith made a $4,850.00 purchase of men's clothing from Revive in Birmingham, Michigan. Smith also made a $5,618.00 jewelry purchase from Diamonds Direct in Southfield, Michigan on January 24, 2013.

29.     The March 2013 American Express statement showed a $12,900.44 charge from Draper Chevrolet Toyota in Saginaw, Michigan on March 8, 2013. The following day, there was a $17,452.80 charge from Louis Vuitton. Comerica and American Express statements showed that on March 14, 2013, Smith made a $96,002.12 electronic payment from the Conservancy's Comerica account ending -0923 to his American Express account.

30.     FBI review of the June 2013 American Express statement revealed that Smith used more than $22,000 of Conservancy funds for his residence. The Amex card issued in Smith's wife's name included the following charges:

12

| Date | Description | Amount |
|------|-------------|--------|
| 6/10/2013 | Scott Shuptrine Interiors Royal Oak | $2,122.00 |
| 6/10/2013 | Trugreen: Lawn Care | $167.48 |
| 6/10/2013 | Scott Shuptrine Interiors Royal Oak | $3,250.00 |
| 6/15/2013 | The Home Depot | $169.43 |
| 6/17/2013 | Art Van Furniture | $500.00 |
| 6/20/2013 | Wayfair: Jemma Hall Mirror | $376.90 |
| 6/28/2013 | Wayfair: Lindsey Pillow,  Bristol Butter Warmer, 8 Piece Nantucket Set, 21 Piece Lugano Taster Series | $272.45 |
| 6/29/2013 | The Home Depot | $7,247.87 |
| 6/29/2013 | Sherwood Studios West Bloomfield | $8,000.00 |

According to their website[7], "The Scott Shuptrine name is synonymous with luxury. We bring an exclusive, premium level of home furnishings and service to Illinois, Michigan, and Ohio making world-renowned interior design accessible for today's discerning décor enthusiast." These household items were funded by Conservancy funds. Comerica and American Express statements showed that on

---

[7] https://www.scottshuptrine.com/about/

13

July 1, 2013, Smith made a $56,142.73 electronic payment from the Conservancy's Comerica account ending -0923 to his American Express account.

31.    Based upon FBI interviews with Conservancy staff and review of bank documents, the Conservancy had a corporate credit card account from Citizens Bank, not American Express. Per an FBI interview with Conservancy interim CEO R.S., he noticed huge payments to American Express on the Comerica statements. R.S. contacted other Conservancy employees, M.W. and W.W., who were also surprised by the American Express transactions because the Conservancy did not have an American Express corporate charge card account. Smith was not authorized to use Conservancy funds to pay personal expenses, and based upon FBI review of American Express statements located in Smith's office, it appears that Smith used his American Express card for transactions that were not legitimate business expenses.

32.    The payments to American Express using Conservancy funds continued until March 2024. Pricewaterhouse Coopers (PwC), an accounting firm hired by the Conservancy, has conducted an analysis of the available bank records. PwC reported that there were approximately $14.9 million in Amex Epayments from the Conservancy Comerica account ending -0923 between November 2012

14

and March 2024.  PwC compiled this information on a spreadsheet. The FBI has reviewed the PwC spreadsheet and the underlying bank records and can verify the accuracy of the PwC computations.

33.    The Amex Epayments were identified on the statements as ACH transactions. All ACH payments are routed and processed by the U.S. Federal Reserve or the Clearing House Payments Company, a private business owned by 24 of the world's largest commercial banks.[8] The Clearing House's ACH payments service, called the Electronic Payments Network, is responsible for approximately half of all U.S. commercial ACH payment volume. The U.S. Federal Reserve banks handle the other half of ACH transactions. Because SMITH made electronic payments online from locations in Michigan, using an account at Comerica Bank which has its headquarters in Texas, to American Express which has its payment processing facility in California, all via the ACH system, there is probable cause to believe that SMITH caused certain writings, signs, or signals to be transmitted by means of wire communication in interstate commerce for the purpose of executing this scheme.

---

[8] https://www.forbes.com/advisor/banking/ach-payments/#What%20Is%20Ach?

*The Joseph Group*

34.     Beginning in February 2013, SMITH wired funds from the
Conservancy's account ending -0923 to The Joseph Group.[9] As indicated above,
Smith formed The Joseph Group & Associates approximately four months earlier.
On February 4, 2013, there was a $95,000 wire transfer from the Conservancy's
Comerica account ending -0923 to The Joseph Group, followed by another
$75,000 a week later.

35.     The FBI has interviewed the Chairman of the Conservancy Board as
well as the Conservancy's staff accountant. Based upon those interviews, the
Joseph Group was not an approved vendor and has not provided any goods or
services to the Conservancy.

36.     Comerica bank statements for account ending -0923 showed 259 wire
transfers to The Joseph Group between 2013 and 2024.

37.     PwC reported that there were approximately $24.4 million in wire
transfers from the Comerica account ending -0923 to The Joseph Group between

---

[9] Comerica bank statements truncated the wire beneficiary name to "The Joseph
Gro."

February 2013 and February 2024. PwC compiled this information on a spreadsheet. The FBI has reviewed the PwC spreadsheet and the underlying bank records and can verify the accuracy of the PwC computations.

*The Concealment*

38.     Smith concealed the above payments to his American Express and The Joseph Group accounts from the Conservancy's employees and board members. Smith, as the CFO, was the immediate supervisor of W.W., a staff accountant, who has worked for the Conservancy since 2009. W.W. was responsible for recording transactions in the Conservancy's QuickBooks database, a popular accounting software used by small businesses and accountants.

39.     Smith provided W.W. with paper copies of the Comerica bank statements for the Conservancy's account ending in -0923. Since the COVID-19 pandemic, W.W. has worked remotely and met Smith roughly four times a year at the parking lot of a Honey Baked Ham store in Ann Arbor, Michigan. W.W. was expected to complete the QuickBooks entries, which included inputting the Comerica bank transactions, within three days. W.W. asked Smith for access to the Comerica online banking portal so that she could pull the transaction history directly, but Smith ignored her requests, providing her with paper statements only.

17

Smith was the only individual at the Conservancy who had the password for the Comerica online banking portal.

40.     The paper statements provided by Smith to W.W. were altered. These statements falsely inflated the available balance in the account and replaced the transactions involving American Express ACH payments and wire transfers to The Joseph Group with other fictitious information.  For example, the FBI compared the statements which Smith had given to W.W. for July 2023 (the SMITH statements) with statements obtained directly from Comerica Bank (the Comerica statements). The Smith statements showed a beginning balance of $2,058,829.17 on July 1, 2023; and an ending balance of $2,302,164.85 on July 31, 2023. According to the Comerica statements, on July 1, 2023, the true beginning balance was a mere $21,064.87 and the ending balance was $134,161.66 – a difference of more than $2 million between the actual statements and the false statements Smith provided W.W.

41.     Both the Smith statements and the Comerica statements showed that there were 16 electronic withdrawals in July 2023. However, the Comerica statements showed two wire transfers from the Conservancy's account ending in 0923 to The Joseph Group and an ACH payment to American Express which were

not listed on the Smith statements. Smith replaced these withdrawals with much smaller payments to "American Express Axp Discnt." The following table illustrates how Smith concealed the moneys he took for his own benefit:

| Date | Comerica Statements | | SMITH Statements | |
| | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 7/13/2023 | Wire Bnf The Joseph Gro | $48,600.00 | American Express Axp Discnt | $ 65.15 |
| 7/14/2023 | Amex Epayment ACH Pmt | $51,672.33 | American Express Axp Discnt | $ 72.33 |
| 7/27/2023 | Wire Bnf The Joseph Gro | $26,800.00 | American Express Axp Discnt | $ 82.65 |

The Smith statements showed that the total electronic withdrawals for July 2023 was only $18,540.47. The actual total value of withdrawals shown on the Comerica statements was $148,689.

42.    Smith occasionally provided statements to W.W. in which he replaced withdrawals taken for his own benefit with much larger payments to a known vendor, which also served to conceal his embezzlement. These transactions were intended to appear to be legitimate vendor payments. For example, on September 21, 2023, the Comerica statements showed that there was a $97,200.00 wire transfer to The Joseph Group. On the Smith statements provided to W.W., the $97,200 wire transfer was replaced with a $1,978,205.50 wire transfer to State of Michigan. A Post-It note on the statement Smith gave to W.W. indicated

19

$1,978,205.50 was to pay MDOT. The Michigan Department of Transportation is an approved vendor for the Conservancy and serves in a general contractor capacity for improvement projects on the riverfront. The undersigned agent believes that the purported payment to MDOT for work allegedly performed at this time was fictitious and intended to conceal many of the large disbursements to Smith's American Express account and The Joseph Group over time.

*Citizens Bank Loan*

43.    On May 8, 2024, Conservancy personnel discovered that the Conservancy had obtained a $5 million line of credit with Citizens Bank. The Conservancy's operating expenses and working capital were funded through public and private grants. (See ¶ 19 above). The FBI interviewed the Conservancy's Chair, former CEO, interim CEO, and Corporation Secretary and they unanimously told the FBI that the Conservancy's donations and public funding were more than sufficient to cover its projects and legitimate expenses, and there was no need for such a line of credit.

44.    An internal search of the Conservancy's e-mail server, conducted by their IT manager, revealed messages between Smith and B.A., a vice president and relationship manager at Citizens Bank. On March 29, 2023, B.A. e-mailed Smith

asking "Do you have documentation that supports you as sole signer for all things related to financing?" Smith responded two hours later saying "Attached is requested info. Also rate is fine. Thanks for getting this done." Attached to Smith's e-mail was a "Corporation Certificate of Authority," purportedly signed by J.P., Corporation Secretary, on December 9, 2022. According to the document, the Board of Directors resolved during a meeting on December 8, 2022 that Smith, as CFO, was fully authorized to "execute and commit the Corporation to the conditions, obligations, stipulations and undertakings contained in any Contract."

45.     The FBI interviewed J.P. about the Corporation Certificate of Authority. J.P. stated that this was not her signature and that she had not seen the document prior to May 8, 2024.  Prior to the interview, J.P. reviewed the Board of Directors' records and her personal calendar. Neither the agenda for the December 8, 2022 board meeting nor the minutes of that meeting referred to any resolution such as the one described in Smith's e-mail to B.A. granting him authority. The records did show that Smith was present at the December 8, 2022 board meeting. Also, J.P. stated that on December 9, 2022, the day she purportedly signed the certificate, she was working offsite all day.

46.     Citizens Bank approved and funded the line of credit on March 31, 2023. The original credit limit was $3.5 million. An additional $2 million was approved on March 18, 2024.   Banks routinely disburse funds from lines of credit through internal credits to checking accounts at the same financial institution.

47.     The Conservancy maintained a commercial checking account ending -6260 at Citizens Bank. This account was designated as the Conservancy's General Operating Account. Citizens Bank statements showed that there was a $2.5 million commercial loan deposit into this account on January 18, 2024. On the same date, the Citizens statements showed a $175,000 outgoing wire transfer. The Comerica statements for account ending -0923 showed an incoming wire transfer of $175,000 on the same date. Therefore, the undersigned agent believes that Smith wired $175,000 of the Citizens loan proceeds into the Comerica account ending -0923.

48.     It was necessary for Smith to wire the funds from the Citizens Bank account into the Comerica Bank account because W.W., the Conservancy's staff accountant, had online access to the Citizens banking portal. As stated above, Smith ignored W.W.'s requests for similar access to the Comerica portal forcing W.W. to rely upon paper statements provided by Smith.

22

49.      The Comerica statements showed that there was a $126,300 wire

transfer to The Joseph Group on January 22, 2024. There was also a $65,226.00

Amex Epayment on January 23, 2024. Without the money from the Citizens Bank

transfers, there would not have been sufficient funds for Smith to make the

payments to The Joseph Group and his American Express account.

### Scope of Defendant's Fraud

50.      Smith has received substantial funds as a result of his fraudulent

conduct, as described herein, in the amount of at least $39,300,000.00, even

without inclusion of the $5M loan from Citizens Bank.[10]

51.      *Summary of Wire/Bank Fraud Allegations*: As described above,

WILLIAM SMITH made numerous electronic funds transfers from the

Conservancy's Comerica account ending -0923 for his own personal benefit and

enrichment. He also created false and fraudulent Comerica Bank statements to

conceal payments to his company, The Joseph Group. His fraudulent Comerica

---

[10] *See* ¶¶ 32 ($14.9M to American Express) and 37 ($24.4M to the Joseph
Group). The calculations herein are as of the date of this Complaint, and the United
States reserves the right to modify the calculations as the investigation continues.
The amount that Smith has derived from fraud is likely higher.

Bank statements also concealed his use of Conservancy funds to pay American Express bills for cards issued to SMITH and his family members. Together, these unauthorized payments (to The Joseph Group and American Express) totaled approximately forty million dollars. SMITH personally provided these false and fraudulent Comerica Bank statements to the Conservancy's staff accountant. The false information in those statements was used to generate reports relied upon by the board of directors. Having exhausted the Conservancy's cash holdings, SMITH obtained a five-million-dollar line of credit from Citizens Bank in an effort to cover cash shortfalls caused by his embezzlement, and for his own benefit. The Citizens Bank line of credit was approved and funded based upon SMITH's false and fraudulent representations that he was authorized by the Conservancy to act independently on its behalf.

52.    Thus, Smith executed a scheme to obtain money from the Conservancy and Citizens Bank based upon false and fraudulent representations in violation of Title 18 United States Code §§ 1343 and 1344.

B. Ongoing Alienation of Criminal Proceeds

53.    Although investigation is ongoing, it appears that Smith has used the millions he defrauded from the Conservancy, along with his own funds, to amass

and/or improve a substantial amount of real property in the U.S. states of Michigan (including Northville, Redford, Detroit, and Idlewild), Texas, Georgia, and the country of Mexico.  His efforts are facilitated by numerous LLCs under his direction and control.

54.     Smith had notice that his conduct was being discovered months ago, when the Conservancy became concerned about the bookkeeping and requested additional explanations of sources and uses of Conservancy funds from Smith. Before the federal government even became involved, Smith was told that the case was being referred to law enforcement.

55.     FBI investigation reveals that Smith is engaging in an ongoing effort to transfer assets that would otherwise be available to repay his victims.

56.     **Georgia Home for sale:** Smith controls a property at 2087 Holtz Ln., Atlanta, GA, which as of June 21, 2024, is listed for sale at a price of $799,900. He purchased the property in his own name on November 9, 2020, for $665,002.00, and on November 20, 2020, transferred the property by quit claim deed to YBE Investments, LLC, an entity under his control.  According to a Zillow

listing page,[11] the house has been listed for sale since May 28, 2024, less than 2 weeks after Smith was placed on unpaid leave.

57. **Mexico condo for sale:** Smith also appears to control a two-bedroom, two-bathroom condominium in Mexico that is listed for sale. A document dated November 3, 2021, left in Smith's office at the Conservancy shows Smith, on behalf of Alter Ego Properties, LLC, granting a power of attorney to an individual named Sharah Rose, limited to a condominium unit at Pedregal One 203, in Los Cabos, Baja California Sur, Mexico. As of June 12, 2024, the condominium was listed for sale with a price of $385,000 according to two public websites (the second of which now says that the "Status" is "CLOSED" while the first still lists the property for sale as of June 21, 2024).[12] A review of available records indicates that the condo was likely built in 2021 or later.

58. **36' Yacht for sale:** FBI investigation has also revealed that Smith

---

[11] https://www.zillow.com/homedetails/2087-Holtz-Ln-NW-Atlanta-GA-30318/2082894034_zpid/

[12] See https://www.point2homes.com/MX/Home-For-Sale/Baja-California-Sur/Los-Cabos/Cabo-San-Lucas-Pacific-Side/Pedregal-One-203/155195689.html; and https://for-sale.ownincabo.com/idx/details/listing/b349/23-4597/Cabo-San-Lucas-BS-23450?widgetReferer=true

owns a yacht that he has recently attempted to sell. The yacht in question is a 2021, 36-foot Cruisers 35 Express, with hull number CRSEC214B021, named the "SS DUO." State of Michigan records reflect that Smith purchased the watercraft on May 21, 2021. On June 6, 2024, contact was made with the attorney for the entity that originally sold the boat to Smith, who advised that the listing to sell the boat recently expired, but that it would not be extended because of the notoriety related to Smith. The vessel was listed for sale recently this year, during the period that Smith had notice of potential criminal and civil liability. Similar yachts appear to be listed for sale online at prices ranging from $300,000 to $375,000. The yacht is believed to be dry docked at a Detroit area marina.

59. Given that Smith obtained $39.3 million in fraud proceeds over 12 years, while making less than $3 million total in that timeframe from his Conservancy salary, and his pattern of transferring criminal proceeds to LLCs in his control or spending them on his own pursuits, the United States alleges that Smith obtained or improved the great majority of his numerous assets with fraud proceeds. This is particularly obvious in the case of the Georgia home, the Mexico condo, and the Cruisers 35 Express yacht, in that these are high-value luxury assets purchased during the fraud period.

27

60.     If Smith succeeds in his active efforts to sell the Georgia home,

Mexico condo, or yacht, the corresponding monetary transaction would be a

criminal violation of 18 U.S.C. § 1957, if they constitute transactions exceeding

$10,000 in criminally derived property.

61.     **Recent Transfer of Marital Home:** In May, Smith purported to

transfer his longtime marital residence at 25307 Ross Drive, Redford, MI 48239.

Although not currently his primary residence, William Smith has owned the home

since 2003 with his wife, Kimberly Smith, via warranty deed.  But on May 6,

2024, Smith and his wife purported to transfer the property by quit-claim deed to

Ross Drive, LLC, for the sum of $10.00 dollars.  The deed lists Kimberly Smith as

the "Sole Member" of Ross Drive LLC, and the Grantor's addresses as "Mr.

William Smith and Mrs. Kimberly Smith" of the same address that they

purportedly sold: 25307 Ross Drive Redford, MI 48239.

62.     **Recent Transfer of Detroit Properties:** On April 23, 2024, Smith

purported to transfer the real property at 16510 Biltmore Street, Detroit, MI, from

"William Anthony Smith" to "William Smith III" for the sum of $10.00, by quit

claim deed.  The quit claim deed was witnessed by the same individuals who

witnessed to the deed purporting to convey 25307 Ross Drive to Ross Drive LLC,

including Rashad Reeves.  As of June 9, 2024, public real estate websites estimate the true value of the home between $93,600 and $114,000.[13]  The quit claim deed was recorded May 21, 2024, four days after the Conservancy placed Smith on unpaid leave.  In addition, on that same day (April 23, 2024), Smith purported to transfer the real property at 16527 Biltmore Street, Detroit, Mi, from YBE Property Group LLC to You Services, LLC with Darrell Greer as Managing Member for the sum of $35,000, by quit claim deed.  This transaction was also witnessed by Rashad Reeves.  **Ex. 14.**  As of June 21, 2024, Redfin estimates the true value of the home as $79,939.[14]

63.     At this stage of the ongoing investigation, the FBI has identified the following assets (in addition to those listed above, and excluding financial/ monetary accounts) in which Smith has an interest or recently purported to transfer:

a)     TWO (2) 2021 CAN-AM MOTORCYCLES

---

[13] https://www.realtor.com/realestateandhomes-detail/16510-Biltmore-St_Detroit_MI_48235_M43371-15535 ($114,000); https://www.zillow.com/homedetails/16510-Biltmore-St-Detroit-MI-48235/88570438_zpid/ ($93,600).

[14] https://www.redfin.com/MI/Detroit/16527-Biltmore-St-48235/home/98538138

b)    ONE (1) 2021 36' CRUISERS 35 EXPRESS YACHT
c)    880 E. M.L. KING DR., IDLEWILD, MI
d)    1977 WOODBRIDGE, DETROIT, MI
e)    2087 HOLTZ LANE, ATLANTA, GA 30318-9304
f)    6405 PENROD, DETROIT, MI
g)    11739 HEYDEN, DETROIT, MI
h)    11914 DEEPWATER RIDGE WAY, CYPRESS, TX 77433
i)    12709 CLOVERLAWN, DETROIT, MI
j)    14026 MARK TWAIN, DETROIT, MI
k)    15791 MURRAY HILL, DETROIT, MI
l)    16500 BILTMORE, DETROIT, MI
m)    16510 BILTMORE, DETROIT, MI
n)    16527 BILTMORE, DETROIT, MI
o)    16700 BILTMORE, DETROIT, MI
p)    16717 RUTHERFORD, DETROIT, MI
q)    17125 W. MCNICHOLS, DETROIT, MI
r)    17207 W. MCNICHOLS, DETROIT, MI
s)    18901 W. MCNICHOLS, DETROIT, MI
t)    18921 W. MCNICHOLS, DETROIT, MI
u)    21291 EQUESTRIAN, NORTHVILLE, MI
v)    PEDREGAL ONE CONDOMINIUMS, UNIT 203, LOS CABOS, BAJA CALIFORNIA SUR, MEXICO

64.    In addition, the FBI has identified the following corporate entities that Smith appears to own, control, and/or use to hide assets ("Smith Entities"):

30

| Entity | Facts Indicating Smith's Control | Relevant Properties |
|---|---|---|
| **Biltmore Development Group, LLC** | Smith established March 2019 as organizer/resident agent and sole officer.  Arends was R/A from February 2023 to June 6, 2024, when she resigned. Address of Record: 16510 Biltmore St., Detroit, MI | 1977 Woodbridge St., Detroit, MI (commercial property), purchased April 2023. |
| **Biltmore Records, LLC** | Smith established December 2016 as resident agent and sole officer.  Arends was R/A from February 2023 to June 6, 2024, when she resigned. Address of Record: 16510 Biltmore St., Detroit, MI | N/A |
| **Bleu Rose Investments, LLC** | Smith established February 2021 as organizer/registered agent and sole officer.  Arends was r/a from February 2023 to June 6, 2024, when she resigned. Address of Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | N/A |
| **First Round Management, LLC** | Smith established February 2024 as resident agent and sole officer. Arends was r/a from February 2023 to June 6, 2024, when she resigned. Address of Record:  Address of Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | N/A. Received $65,000 and $70,000 transfers from The Joseph Group in September 2016. |
| **The YBE Group, LLC** | Smith established April 2002 as resident agent and sole officer. Arends was r/a from February 2023 to June 6, | 16551 Biltmore Street, Detroit, MI |

| | | |
|---|---|---|
| | 2024, when she resigned. Address of Record:  Address of Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | |
| **YBE Food Group, LLC** | Smith established October 2013 as resident agent and sole officer. Arends was r/a from February 2023 to June 6, 2024, when she resigned. Address of Record:  Address of Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | 29555 Northwestern Hwy, Southfield, MI. |
| **YBE Services Group, LLC** | Smith established July 2015 as resident agent and sole officer.  Arends was r/a from February 2023 to June 6, 2024, when she resigned. Address of Record: Address of Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | N/A |
| **YBE Tobacco Group, LLC** | Smith established November 2018 as resident agent and sole officer.  Arends was r/a from February 2023 to June 6, 2024, when she resigned. Address of Record:  Address of  Record: 150 West Jefferson Ave, Suite 100, Detroit, MI. | 1977 Woodbridge St., Detroit, MI |
| **Biltmore Publishing Group, LLC** | Smith established December 2016 as resident agent and sole officer.  Smith filed the last annual statement April 2022.  Address of Record: 16510 Biltmore Street, Detroit, MI | N/A |

| | | |
|---|---|---|
| **48235 Properties, LLC** | Smith established December 2019 as resident agent and sole officer.  No further documentation was submitted to the State of Michigan.  Address of Record: 16510 Biltmore Street, Detroit, MI | Previously owned 18966 Sussex Street, Detroit, MI 48235 |
| **Biltmore Entertainment Group, LLC** | Smith established December 2016 as resident agent and sole officer.  After April 2022, no additional documentation was filed on this property.  Address of Record:  16510 Biltmore Street, Detroit, MI | N/A |
| **The Joseph Group & Associates, LLC** | Smith established October 2012 as resident agent and sole officer.  Entity was inactive between 2018 through 2022.  After April 2022, no additional documentation was filed on behalf of this entity.  Address of Record: 33006 Seven Mile Road, Suite 192, Livonia, MI | N/A. Received $24M+ in Conservancy funds. |
| **William Smith & Associates** | Smith established February 2001 as resident agent and sole officer.  Entity entered periods of dormancy between 2001 and 2022.  After 2022, no additional documents were filed on behalf of this entity.  Address of Record: 33006 Seven Mile Road, #172, Livonia, MI | N/A.  Spent $14M in Conservancy funds via Amex credit cards, including on real property expenses. |

| **Ross Drive, LLC** | Kimberly Smith established April 2024. Address of Record: 33006 West Seven Mile Road, Suite 192, Livonia, MI. Defendant and Kimberly Smith then purported to transfer their marital home—previously owned as husband and wife—over to Ross Drive LLC. | 25307 Ross Drive, Redford, MI |
| **YBE Property Group, LLC** | Smith established July 2015, as resident agent, and sole officer.  Arends was r/a from February 2023 to June 2024, when she resigned. Address of Record:  50 West Jefferson Ave, Suite 100, Detroit, MI. | 17125 W. McNichols Road, Detroit, MI. |
| **YBE Investments, LLC** | Smith established November 2020, through the State of Georgia.  Smith named resident agent February 2021. Address of Record: 2087 Holtz Lane, Atlanta, GA | 2087 Holtz Lane, Atlanta, GA |
| **Alter Ego Properties, LLC** | Entity formed May 2020, by Sharah Rose through the State of Wyoming. Smith filed the 2024 Annual Report. Address of Record: 30 North Gould Street, Sheridan, WY.  Smith acted on behalf of Alter Ego Properties LLC in 2021, giving power of attorney to Rose with regard to the Mexico condo. | Pedregal One Condominiums, Unit 203, Los Cabos, Baja California Sur, Mexico |

65.  **Use of Corporate Entities as Nominees**, **Alter Egos**, **and for**

**Fraudulent Transactions**: on information and belief, (1) Defendant is using the Smith Entities listed below as alter egos of himself, as nominees in transactions designed to hide assets from his victims and law enforcement, as vehicles for moving fraud and money-laundering proceeds, and as vehicles for fraudulent transfers; and (2) the assets of the Smith Entities are therefore property of Smith himself and/or subject to equitable restraint for the protection of the interests of Smith's victims and the United States, including their interests in restitution and forfeiture.

66.     **Summary of Money Laundering Allegations**: As described above, Smith has been using the proceeds of his fraud to*, inter alia*, pay for interior design renovations, airline tickets, hotels, limousines, household goods, lawn care, clothing, and jewelry.  This is reflected in Smith using Conservancy funds to pay approximately $14.9 million in American Express credit card bills from 2012 to 2024.  Each of these transactions commingled the proceeds of his offenses with other property that he purchased before and during the criminal activity, transforming victim funds into individual assets, and concealing the nature, location, source, ownership, and control of his fraud proceeds.  Furthermore, many of these individual transactions involved more than $10,000 in fraud proceeds.

35

67.    Thus, Smith appears to have knowingly conducted transactions using

the proceeds of his fraud in transactions designed to conceal the nature, location,

source, ownership, and control of those proceeds, in violation of Title 18 United

States Code § 1956.  Furthermore, Smith also appears to have knowingly

conducted transactions involving property of a value greater than $10,000 derived

from fraud, in violation of Title 18 United States Code § 1957.

68.    For example, on September 1, 2016, Smith wired $85,000 in

Conservancy funds to The Joseph Group, and another $87,500 on September 15,

2016. On September 2, 2016, Smith transferred $65,000 from The Joseph Group

account to the First Round Management account.  On September 15, 2016, Smith

transferred $70,000 from The Joseph Group Account to the First Round

Management account.  The movement of funds obtained from unlawful activity

through multiple accounts is a technique used in money laundering.

69.    Every time that Smith alienates or transfers an asset that could

otherwise be retained to repay his victims, he contributes to a continuing and

substantial injury to his victims, including the Conservancy, Comerica Bank, and

the Conservancy's donors and financial partners (to include the United States, the

State of Michigan, and the City of Detroit) which justifies injunctive relief under

36

18 U.S.C. § 1345(a)(2) and (b).

## **FIRST CLAIM FOR RELIEF**

70.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs as if fully set forth herein.

71.     Defendant has received substantial assets as a result of his fraudulent conduct, as described herein, in the amount of at least $39,300,000.00.

72.     Upon information and belief, Smith is in the process of withdrawing, transferring, removing, dissipating, and disposing of these assets, including transferring assets to family members for nominal amounts, and attempting to sell real estate and his yacht to third parties.

73.     Pursuant to 18 U.S.C. § 1345(a)(2), if Smith is alienating or disposing of property obtained as a result of violations of 18 U.S.C. § 1343 (Wire Fraud) affecting a financial institution, and/or 18 U.S.C. §§ 1956 and 1957 (Money Laundering), the United States is entitled to an order enjoining such alienation or disposition, or an order prohibiting Defendant from withdrawing, transferring, removing, dissipating or disposing of such property or property of equivalent value.

74.     The loss of this $39.3 million—and likely more—is a continuing and substantial injury to the Conservancy, Comerica Bank, the United States, and the

Conservancy's donors and financial partners (to include the State of Michigan, and the City of Detroit).

75.    Pursuant to 18 U.S.C. § 1345 (b), the United States is entitled to an order enjoining any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value under Smith's control, and freezing Smith's assets up to the total amount of $44,300,00.00.

76.    Congress enacted 18 U.S.C. § 1345(a)(2) and (b) to authorize injunctive relief to protect victims of fraud in these circumstances.

## SECOND CLAIM FOR RELIEF

77.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the previous paragraphs as if fully set forth herein.

78.    On information and belief, Defendant is committing or about to commit banking law violations (as defined in 18 U.S.C. 3322(d)), by his attempts to sell assets derived from criminal proceeds with a monetary value in excess of $10,000, which would violate 18 U.S.C. § 1957. For example, Smith appears to be attempting to sell the Georgia home, Mexico condo, and yacht which were purchased during his lucrative period of fraud from 2012-2024.

79.    Pursuant to 18 U.S.C. § 1345(a)(1), the United States is entitled to an

order enjoining criminal violations of 18 U.S.C. § 1957.

80.     The loss of this criminal proceeds via these attempted sales—and any transactions already completed—is a continuing and substantial injury to the Conservancy, Comerica Bank, the United States, and the Conservancy's donors and financial partners (to include the State of Michigan, and the City of Detroit).

81.     Pursuant to 18 U.S.C. § 1345(a)(1) and (b), the United States is entitled to an order enjoining Smith from violating 18 U.S.C. § 1957 by selling or transferring any property derived from unlawful activity in an amount in excess of $10,000, including the Georgia home, Mexico condo, and yacht.

82.     Congress enacted 18 U.S.C. § 1345(a)(1) and (b) to authorize injunctive relief to protect victims of fraud in these circumstances.

## **Prayer for Relief**

WHEREFORE, the United States requests, pursuant to 18 U.S.C. § 1345, and the Court's equitable authority (including the All Writs Act, 28 U.S.C. § 1651) that the Court:

1) Enter appropriate findings, to include a finding that Smith's assets, funds, or other property up to a total value of $39,300,000 constitute either property

obtained as a result of banking law violations as detailed above or property of equivalent value, within the meaning of 18 U.S.C. § 1345(a)(2).

2) Enter injunctive relief—to include a temporary restraining order, preliminary injunction, and a permanent injunction—prohibiting any person from transferring or disposing of Defendant's assets (to include the assets of his corporate entities) up to a total value of $39.3 million dollars. This asset freeze order should except only (1) necessary and reasonable living expenses, (2) necessary and reasonable expenses of any ongoing, legitimate business operations, and (3) use of any untainted funds that are necessary and reasonable to pay Smith's counsel of choice in his criminal case, pursuant to *Luis v. United States*, 578 U.S. 5, 18 (2016). The Government requests that release of funds pursuant to these exceptions be granted only upon good cause shown by application to the Court with notice to and an opportunity for the United States to be heard.

3) Authorize service of this Order on Defendant, his companies, agents, and financial institutions, and any other relevant entity or person.

4) Require Defendant and the Smith Entities to show cause, if there be any, why the Court should not enter a preliminary injunction extending this relief pending a final adjudication on the merits.

5) Enjoin Smith from violating 18 U.S.C. § 1957 (and/or 18 U.S.C § 1956) by selling or transferring any property derived from unlawful activity in an amount in excess of $10,000, including the Georgia home, Mexico condo, and yacht.

6) Enter "such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought."  18 U.S.C. § 1345(b).

7) Order other appropriate relief as permitted by federal law and this Court's equitable powers, including but not limited to the All Writs Act, 28 U.S.C. § 1651.

Respectfully submitted,

Dawn N. Ison
United States Attorney

/s/ K. Craig Welkener
K. Craig Welkener

41

Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-0248
Kenton.welkener@usdoj.gov
DC Bar No. 1033585

*s/ Jessica A. Nathan*
JESSICA A. NATHAN
Assistant United States Attorney
TX Bar 24090291
211 W. Fort St., Ste. 2100
Detroit, MI 48226
313-226-9643
Jessica.Nathan@usdoj.gov

Date: June 21, 2024

─────────────────────

## **VERIFICATION**

I, Timothy Hoff, state that I am a Special Agent of the Federal Bureau of Investigation ("FBI").  I have read the foregoing Complaint and declare under penalty of perjury that the facts contained therein are true and correct to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents and employees of the United States Government.

Timothy Hoff
Special Agent
Federal Bureau of Investigation

Dated:   June 21, 2024