IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  24-cv-11626 |
| | Hon. Linda V. Parker |
| Plaintiff, | |
| | Emergency *Ex Parte* Motion for |
| v. | Temporary Restraining Order Pursuant |
| | to 18 U.S.C. § 1345 |
| WILLIAM ANTHONY SMITH, | |
| | Affidavit of Timothy Hoff with |
| Defendant. | Exhibits 1-39 |
| | |
| | Fed. R. Civ. Pro. 65(b)(1)(B) |
| | Certification of K. Craig Welkener |
| | |
| | **Filed Under Seal** |

**EMERGENCY *EX PARTE* MOTION OF THE UNITED STATES
FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE**

Defendant William Anthony Smith has defrauded the Detroit Riverfront

Conservancy of at least $39.3 million, and defrauded Citizens Bank of $5 million,

in part to cover his tracks.  None of those funds have been recovered to date.

Defendant appears to be actively hiding or dissipating the proceeds of his criminal

offenses, already with some success.  As of this filing, Defendant has a condo in

Mexico and a home in Atlanta, Georgia listed for sale (with the Mexico property

listed as "PENDING" over the weekend and now listed as "CLOSED" on one

website).  He has recently sought to sell his 36-foot yacht, and he has recently purported to transfer his marital home and another property in Detroit for nominal sums.

Plaintiff United States of America, by and through its undersigned counsel, moves for a restraining order under 18 U.S.C. § 1345 and the Court's equitable authority, freezing the assets of Defendant William Anthony Smith by preventing any person from transferring or disposing of the funds that he obtained from fraud and money laundering, or Smith's property of equivalent value, up to a total value of $39,300,000.  This includes the assets of the corporate entities that Smith controls and is using as nominees, alter egos, vehicles for fraudulent transfers, and vehicles for movement of criminal proceeds.

Pursuant to applicable case law, the proposed injunction contains exceptions upon application to the Court, for (1) necessary and reasonable living expenses, (2) necessary and reasonable expenses of any ongoing, legitimate business operations, and (3) use of any untainted funds that are necessary and reasonable to pay Smith's counsel of choice in his criminal case.

The Government also asks the Court to order Defendant and his companies to show cause, if there be any, why the Court should not enter a preliminary injunction extending this relief pending a final adjudication on the merits.

To prevent Defendant from accomplishing additional asset dissipation while this Motion is pending, to the irreparable harm of his victims, this Motion is filed *ex parte*. *See* Rule 65(b)(1) Certification of K. Craig Welkener, attached. The Government also asks the Court for permission to promptly serve this Order on financial institutions and other appropriate entities and then upon Defendant himself, including by alternative means as detailed in the proposed order.

The reasons for these requests are set for in the underlying Complaint attached Brief, supporting Affidavit of FBI Special Agent Timothy Hoff, and Rule 65(b)(1)(B) Certification of K. Craig Welkener, as well as in the related criminal action, Case No. 24-mc-30217.

Respectfully submitted,

Dawn N. Ison
United States Attorney


*/s/ K. Craig Welkener*
K. Craig Welkener (DC Bar No. 1033585)
Jessica A. Nathan (TX Bar 24090291)
Assistant United States Attorneys
(313) 226-0248 (Welkener)
313-226-9643 (Nathan)
Kenton.welkener@usdoj.gov
Jessica.Nathan@usdoj.gov

Date: June 21, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No.  24-cv-<br>Hon. |
| v. | |
| WILLIAM ANTHONY SMITH, | **Filed Under Seal** |
| Defendant. | |

**BRIEF IN SUPPORT OF EMERGENCY *EX PARTE* MOTION
FOR A TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE**

## Table of Contents

Issue Presented ............................................................................................5

Controlling Authorities ................................................................................5

Table of Contents .........................................................................................5

I.    Introduction ...........................................................................................7

II.   Statement of Facts .................................................................................7

III.   Legal Standard .....................................................................................8

IV.   Discussion ...........................................................................................11

   A.    Smith Committed Predicate Crimes With Proceeds of $39.3M .................12

   B.    Smith is Actively Dissipating Criminal Proceeds ......................................15

   C.    The Proposed Order is Proper in Scope ....................................................19

   D.    The Proposed Order Adopts the Proper Procedure ....................................31

   E.    Other Courts Have Granted Similar Relief .................................................31

V. Conclusion ...............................................................................................33

## Issue Presented

*Whether the Court should enter the accompanying temporary restraining order, freezing Defendant's assets up to $39.3 million for 14 days, and ordering Smith and his companies to show cause why a preliminary injunction should not be entered granting the same relief.*

## Authorities

<u>*Statutes*</u>

18 U.S.C. § 1345

28 U.S.C. § 1651

<u>*Cases*</u>

*United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993)

*Luis v. United States*, 136 S.Ct. 1083, 1088 (2015)

*United States v. DBB, Inc.*, 180 F.3d 1277, 1286 (11th Cir. 1999)

## I.   Introduction

This case amounts to a public emergency, with a remedy pre-selected by Congress.

As alleged by criminal complaint, from 2012 to 2024 Defendant defrauded Detroit's riverfront project to the tune of $39.3 million, eventually taking out a $5 million loan in the Detroit RiverFront Conservancy's name for his own purposes, and to cover his tracks. He is now actively selling and transferring assets that could otherwise be forfeited and used for restitution.

Unless emergency relief is granted, Defendant will be able to freely alienate and transfer the proceeds of his criminal offenses, with each transfer potentially making restitution and forfeiture that much more impossible. For the victims of these offenses, and pursuant to 18 U.S.C. § 1345, the Government asks the Court to immediately grant the requested Temporary Restraining Order (TRO).

## II.   Statement of Facts

The factual allegations in the Verified Complaint are incorporated by reference as though fully stated herein. Those allegations are supplemented via the attached Declaration of FBI Special Agent Tim Hoff, along with the exhibits thereto, demonstrating the ongoing dissipation of assets, and use of Smith's

corporate entities as nominees, alter egos (to include an entity holding a Mexico

condo named Alter Ego Properties, LLC), and for fraudulent transfers.

These allegations are only a relevant summary of what Smith is known to be

doing to hide and spend criminal proceeds and his amassed property portfolio.  His

actual efforts are almost certainly more substantial, and ongoing investigation will

supplement the facts presented today.

### III.   Legal Standard

This civil action for injunctive relief is governed by the Anti-Fraud

Injunction Statute, 18 U.S.C. § 1345.  The statute reads:

> (a)(1)If a person is—
>> (A) violating or about to violate this chapter or section 287, 371 (insofar as such violation involves a conspiracy to defraud the United States or any agency thereof), or 1001 of this title;
>> (B) committing or about to commit a banking law violation (as defined in section 3322(d) of this title); or
>> (C) committing or about to commit a Federal health care offense;
>> the Attorney General may commence a civil action in any Federal court to enjoin such violation.
> (2) **If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title)** or a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court—
>> **(A) to enjoin such alienation or disposition of property; or**
>> **(B) for a restraining order to—**

8

> **(i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value**; and
>
> (ii) appoint a temporary receiver to administer such restraining order.
>
> (3) A permanent or temporary injunction or restraining order shall be granted without bond.
>
> (b) **The court** shall proceed as soon as practicable to the hearing and determination of such an action, and **may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury** to the United States or to any person or class of persons for whose protection the action is brought. A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

18 U.S.C. § 1345 (emphasis added).

"The United States bears the burden of proof of establishing that fraud has been committed, and the extent of that fraud, under section 1345." *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993).

In the typical case involving a request for a TRO or preliminary injunction, courts consider four factors: "(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay." *Ne. Ohio*

*Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016).

However, most courts hold that the traditional factors do not apply when the Government is seeking an injunction pursuant to a federal statute that was enacted to protect the public, and authorized injunctive relief.  *E.g. United States v. Brown*, 988 F.2d 658, 660-64 (6th Cir. 1993) (considering an injunction under Section 1345 by referencing the statutory language and legislative history, not by weighing—as the district court did—the four factors); *United States v. American Therapeutic Corporation*, 797 F.Supp.2d 1289, 1291 (S.D. Fla. 2011); *United States v. Sriram*, 147 F.Supp.2d 914, 935-37 (N.D. Ill.) ("Although the question is a close one, the Court agrees with the prevailing weight of authority that to prove an entitlement to a preliminary injunction under Section 1345, the Government need not prove all of the elements traditionally required by Rule 65."); *See also Burlington Northern Ry. Co. v. Blair*, 957 F.2d 599, 601-02 (8th Cir. 1992) ("[i]t is well established that where Congress expressly provides for injunctive relief to prevent violations of a statute, a plaintiff does not need to demonstrate harm to secure an injunction.")

Regardless of whether the Court analyzes the statute alone, or considers the four traditional factors, a temporary restraining order should be entered.  All statutory factors are satisfied, the Government has shown a high likelihood of

success on the merits, irreparable injury is ongoing, no substantial harm to others is likely, and the public interest would be served by freezing the Defendant's assets.

## IV.  Discussion

This case satisfies all requirements for immediate injunctive relief.  Pursuant to 18 U.S.C. § 1345, this Court has the power to remedy the ongoing dissipation of Smith's assets gained, in whole or in part, from his enormous fraudulent scheme, and "property of equivalent value."  18 U.S.C. § 1345(a)(2)(B)(i).

The Court should therefore enter a TRO and Order to Show Cause (1) prohibiting any person from transferring or disposing of Defendant's assets (to include the assets of his corporate entities) up to a total value of $39.3 million dollars, and requiring Defendant and his companies to show cause, if there be any, why the Court should not enter a preliminary injunction extending this relief pending a final adjudication on the merits.

As detailed below in Discussion sections A-E, (A) Smith committed the predicate crimes, (B) he is actively dissipating criminal proceeds, (C) the proposed order is proper in scope, (D) the proposed order adopts the proper procedures for temporary and potential preliminary relief, and (E) other courts have ordered similar relief. Though organized based on the statutory requirements, this brief addresses throughout how the underlying facts satisfy the traditional factors for issuing a TRO, particularly in Sections A-C.

11

### A.      Smith Committed Predicate Crimes With Proceeds of $39.3M

The first predicate for injunctive relief under Section 1345 is a qualifying

criminal offense.  Here, Smith's scheme has violated four predicate statutes: 18

U.S.C. §§ 1343 (Wire Fraud), 1344 (Bank Fraud), 1956 (Concealment Money

Laundering), and 1957 (Transactions Exceeding $10,000 in Criminally Derived

Property), with total proceeds of these offenses amounting to at least $39,300,000

dollars.  *See* 18 U.S.C. § 1345(a)(1), (a)(2), and (b).

As described in the Complaint, Smith made numerous electronic funds

transfers from the Conservancy's Comerica account ending -0923 for his own

personal benefit and enrichment. He also created false and fraudulent Comerica

Bank statements to conceal payments to his company, The Joseph Group. His

fraudulent Comerica Bank statements also concealed his use of Conservancy funds

to pay American Express bills for cards issued to SMITH and his family members.

Together, these unauthorized payments (to The Joseph Group and American

Express) totaled approximately $39.3 million dollars. SMITH personally provided

these false and fraudulent Comerica Bank statements to the Conservancy's staff

accountant. The false information in those statements was used to generate reports

relied upon by the board of directors. Having exhausted the Conservancy's cash

holdings, SMITH obtained a five-million-dollar line of credit from Citizens Bank

in an effort to cover cash shortfalls caused by his embezzlement, and for his own benefit. The Citizens Bank line of credit was approved and funded based upon SMITH's false and fraudulent representations that he was authorized by the Conservancy to act independently on its behalf.  This constitutes a scheme to obtain money from the Conservancy and Citizens Bank based upon false and fraudulent representations in violation of Title 18 United States Code §§ 1343 (wire fraud) and 1344 (bank fraud).

As he embezzled millions of the Conservancy's funds, Smith used the proceeds of that fraud to, inter alia, pay for interior design renovations, airline tickets, hotels, limousines, household goods, lawn care, clothing, and jewelry. This is reflected in Smith using Conservancy funds to pay approximately $14.9 million in American Express credit card bills since 2012.  Each of these transactions commingled the proceeds of his offenses with other property that he purchased before and during the criminal activity, transforming victim funds into individual assets, and concealing the nature, location, source, ownership, and control of his fraud proceeds.

Thus, Smith knowingly conducted transactions using the proceeds of his fraud in transactions designed to conceal the nature, location, source, ownership, and control of those proceeds, in violation of Title 18 United States Code § 1956. And any transactions involving more than $10,000 in fraud proceeds—including

the purchase of the Georgia home and Mexico condo--constituted a violation of 18 U.S.C. § 1957.

The Complaint, sworn criminal complaint, and evidence attached to this Motion amply prove Smith's offenses.  The underlying evidence includes forged bank statements that contradict official Comerica bank records, a forged Corporation Certificate of Authority, purportedly authorizing Smith on behalf of the Conservancy, "execute and commit the Corporation to the conditions, obligations, stipulations and undertakings contained in any Contract," and interviews with board and staff members at the Detroit RiverFront Conservancy who will attest to the falsity of the documents.

The extent of the fraud is also well-documented.  Based on the underlying bank records, reviewed by both PricewaterhouseCooper and the FBI, the amount the loss is approximately $14.9 million in Amex Epayments, $24.4 million in wire transfers from the Comerica account ending -0923 to The Joseph Group, not even including the $5 million loan from Citizen's Bank obtained by fraud to cover the *original* fraud, for a total of at least $39.3 million in fraud proceeds.

The United States thus has an overwhelming likelihood of success on the merits, which (in this case) would only require the Government to prove its case by a preponderance of the evidence.  *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993).

This satisfies the first predicate for Section 1345 relief.

**B.      Smith is Actively Dissipating Criminal Proceeds**

Although investigation is ongoing, it appears that Smith has used the millions he defrauded from the Conservancy, along with his own funds, to amass and/or improve a substantial amount of real property in the U.S. states of Michigan (including Northville, Redford, Detroit, and Idlewild), Texas, Georgia, and the country of Mexico.  His efforts are facilitated by numerous LLCs under his direction and control.

SMITH had notice that his conduct was being discovered months ago, when the Conservancy became concerned about the bookkeeping and requested additional evidence from Smith.  Before the federal government even became involved, Smith was told that the case was being referred to law enforcement.

**Georgia Home for sale:** Smith controls a property at 2087 Holtz Ln., Atlanta, GA, which as of June 12, 2024, is listed for sale at a price of $799,900. He purchased the property in his own name on November 9, 2020, for $665,002.00, and on November 20, 2020, transferred the property by quit claim deed to YBE Investments, LLC, an entity under his control.  According to a Zillow listing page,[1] the house has been listed for sale since May 28, 2024, less than 2

---

[1] https://www.zillow.com/homedetails/2087-Holtz-Ln-NW-Atlanta-GA-30318/2082894034_zpid/

weeks after Smith was placed on unpaid leave.  *See* Hoff Affidavit ¶ 14; Compl. ¶ 56.

**Mexico condo for sale:** Smith also appears to control a two-bedroom, two-bathroom condominium in Mexico that is listed for sale.  A document dated November 3, 2021, left in Smith's office at the Conservancy shows Smith, on behalf of Alter Ego Properties, LLC, granting a power of attorney to an individual named Sharah Rose, limited to a condominium unit at Pedregal One 203, in Los Cabos, Baja California Sur, Mexico.  As of June 12, 2024, the condominium was listed for sale with a price of $385,000 according to two public websites (the second of which now says that the "Status" is "CLOSED" while the first still lists the property for sale as of June 21, 2024).[2]  A review of available records indicates that the condo was likely built in 2021 or later.  *See* Hoff Affidavit ¶ 15.

**36' Yacht recently for sale:** FBI investigation has also revealed that Smith owns a yacht that he has recently attempted to sell. The yacht in question is a 2021, 36-foot Cruisers 35 Express, with hull number CRSEC214B021, named the "SS DUO."  State of Michigan records reflect that Smith purchased the watercraft on May 21, 2021.  On June 6, 2024, contact was made with the attorney for the entity

---

[2] See https://www.point2homes.com/MX/Home-For-Sale/Baja-California-Sur/Los-Cabos/Cabo-San-Lucas-Pacific-Side/Pedregal-One-203/155195689.html; and https://for-sale.ownincabo.com/idx/details/listing/b349/23-4597/Cabo-San-Lucas-BS-23450?widgetReferer=true

that originally sold the boat to Smith, who advised that the listing to sell the boat recently expired, but that it would not be extended because of the notoriety related to Smith. The vessel was listed for sale recently this year, during the period that Smith had notice of potential criminal and civil liability. Similar yachts appear to be listed for sale online at prices ranging from $300,000 to $375,000. The yacht is believed to be dry docked at a Detroit area marina. *See* Hoff Affidavit ¶ 16.

**Recent Transfer of Marital Home:** In May, Smith purported to transfer his longtime marital residence at 25307 Ross Drive, Redford, MI 48239. Although not believed to be his current primary residence, William Smith has owned the home since 2003 with his wife, Kimberly Smith, via warranty deed. On May 6, 2024, Smith and his wife purported to transfer the property by quit-claim deed to Ross Drive, LLC, for the sum of $10.00 dollars. The deed lists Kimberly Smith as the "Sole Member" of Ross Drive LLC, and the Grantor's addresses as "Mr. William Smith and Mrs. Kimberly Smith" of the same address that they purportedly sold: 25307 Ross Drive Redford, MI 48239. However the mailing address for Ross Drive LLC is the same UPS Store mailbox used by Smith's other entities including The Joseph Group and First Round Management. Hoff Aff. ¶ 19.

**Recent Transfer of Detroit Properties:** On April 23, 2024, Smith purported to transfer the real property at 16510 Biltmore Street, Detroit, MI, from "William Anthony Smith" to "William Smith III" for the sum of $10.00, by quit

17

claim deed: an obviously nominal amount of consideration. As of June 9, 2024, public real estate websites estimate the true value of the home between $93,600 and $114,000.[3] According to LexisNexis public database, "William Smith III" is a known name variation used by Smith himself. The quit claim deed was recorded May 21, 2024, four days after the Conservancy placed Smith on unpaid leave. Although purchased before the fraud in 2004, this property—16510 Biltmore—is the address used for numerous other Smith Entities. *See* Hoff Affidavit ¶ 20; Compl. ¶ 64 (table summarizing Smith Entity information). In addition, placing it beyond the reach of restitution (which reaches any property of the Defendant) would constitute irreparable injury to Smith's victims.

**$39.3 Million:** Given that Smith obtained $39.3 million in fraud proceeds over 12 years while making less than $3 million total in that timeframe from his Conservancy salary (in violation of 18 U.S.C. § 1343 and 1344, *see* Compl. ¶¶ 51-52), and his pattern of transferring those criminal proceeds to LLCs in his control and/or spending them on his own pursuits (in violation of 18 U.S.C. §§ 1956 and 1957, *see* Compl. ¶¶ 66-69), it is obvious that Smith obtained or improved the great majority of his numerous assets with fraud and money laundering proceeds.

---

[3] https://www.realtor.com/realestateandhomes-detail/16510-Biltmore-St_Detroit_MI_48235_M43371-15535 ($114,000); https://www.zillow.com/homedetails/16510-Biltmore-St-Detroit-MI-48235/88570438_zpid/ ($93,600).

Smith appears to have committed money laundering violations by using that $39.3 million to purchase the Georgia home, the Mexico condo, and the Cruisers 35 Express yacht, in that these are high-value luxury assets purchased during the fraud period.

If Smith succeeds (or has already succeeded, in the case of the Mexico condo) in his active efforts to sell the Georgia home, Mexico condo, or yacht, the corresponding monetary transaction would likely constitute further criminal violations of 18 U.S.C. § 1957, because they would constitute transactions exceeding $10,000 in criminally derived property.

Thus, the Government has an overwhelming likelihood showing by a preponderance of the evidence that Smith is dissipating and has dissipated the $39.3 in fraud/money laundering proceeds.  This satisfies the second predicate for Section 1345 relief and the irreparable harm factor in traditional TRO analysis.

## C.    The Proposed Order is Proper in Scope

The TRO requested tracks the statutory language, and each provision thereof is grounded in the Court's legal and equitable authority.  This is the key sentence in the TRO (from Section II ¶a):

> The Court hereby **PROHIBITS** any person from withdrawing, transferring, removing, dissipating, or disposing of Defendant William A. Smith's assets, funds, or other property up to a total value of $39,300,000, subject to the exceptions listed in paragraph (i) below.

19

Each term in this sentence is then defined, and exceptions listed that would allow Smith and/or his entities to seek relief, including for living expenses, expenses of any ongoing, legitimate business operations, and payment of attorney fees.

This tracks the Court's statutory authority "to prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property [obtained as a result of a banking law violation] or property of equivalent value." 18 U.S.C. § 1345(a)(2)(B); *see also* 18 U.S.C. § 1345(b) ("The court … may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought.")

The Order is proper in scope for the following reasons.

*First*, the order restrains the correct amount of property. The Court can and should restrain not only the criminal proceeds, but "property of equivalent value." 18 U.S.C. § 1345(a)(2)(B). Smith's fraud amounted to at least $39.3 in proceeds, and each time that he used stolen money to buy or improve real or personal property, with the intent to conceal the source, location, ownership, or control of his criminal proceeds, he created money laundering proceeds in violation of 18 U.S.C. § 1956. Each time that he moved the fraud/laundering proceeds in a monetary transaction in excess of $10,000, he violated 18 U.S.C. § 1957, creating

more laundering proceeds.  As Smith defrauded the Conservancy of over $39 million—an average of approximately $3.25 million a year—and moved those funds to his coffers or entities, he almost certainly committed numerous Section 1957 violations by moving the funds in amounts exceeding $10,000.

For example, on September 1, 2016, Smith wired $85,000 in Conservancy funds to The Joseph Group, and another $87,500 on September 15, 2016. On September 2, 2016, Smith transferred $65,000 from The Joseph Group account to the First Round Management account.  On September 15, 2016, Smith transferred $70,000 from The Joseph Group Account to the First Round Management account. Compl. ¶ 68. That's two 1957 violations—one for each transfer to First Round Management.  The evidence that Smith is dissipating the proceeds of bank fraud/wire fraud/money laundering violations in an amount of at least $39.3 million is overwhelming.

All of Defendant William A. Smith's assets, funds, or other property up to a total value of $39,300,000 thus constitute property obtained either as a result of banking law violations (as defined in 18 U.S.C. § 3322, including bank fraud, wire fraud affecting a financial institution, and money laundering in the Section 1956 or 1957 varieties) or property of equivalent value, within the meaning of 18 U.S.C. § 1345(a)(2).  The Anti-Fraud Injunction Statute explicitly contemplates restraint in this amount.

Furthermore, this is a conservative estimate of Smith's criminal proceeds, *see e.g.* Compl. §§ 50, 74. and the United States would—upon proof of these allegations—be entitled to distinct restitution and forfeiture money judgments in the amount of at least $39.3 million *each*, because these are distinct remedies. *See* Compl. ¶¶ 11-17, 18 U.S.C. §§ 981 and 982; 28 U.S.C. § 2461; *United States v. Boring*, 557 F.3d 707, 714 (6th Cir. 2009) ("Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity.") And that figure does not even possibly double count the $5 million from Citizen's Bank, which Smith also obtained by fraud and used (at least in part to hide the Conservancy fraud). Thus, restraining only $39.3 million is a conservative measure.

*Second*, for the reasons that follow, the Order is properly limited to Smith' property, to include the assets he has shielded by use of corporate entities as nominees, alter egos, for fraudulent transactions, and as vehicles for the movement of criminal proceeds.

While federal law controls this action under 18 U.S.C. § 1345, state property law determines the property rights of an individual or corporation upon which federal law acts. *See e.g. Aquilino v. United States,* 363 U.S. 509, 512–513 (1960); *Drye v. United States,* 528 U.S. 49, 58, (1999); and *United States v. Craft,* 535 U.S.

274, 278, (2002).  Because this Court sits in equity pursuant to 18 U.S.C. § 1345 (and the All Writs Act), it is particularly well-situated to apply equitable doctrines such as nominee theory, alter ego theory, and fraudulent transactions.  *See e.g. U.S. v. Narco Freedom, Inc.*, 95 F.Supp.2d 747, 761 (S.D.N.Y 2015) ("Section 1345 affords the Court broad equitable authority."); *United States v. Weingold*, 844 F.Supp. 1560, 1573 (D.N.J. 1994) ("Section 1345 has been held to vest the federal courts with power to decree broad remedial preliminary relief");

Under Michigan law, "the fiction of a distinct corporate entity separate from the stockholders is a convenience introduced in the law to subserve the ends of justice. When this fiction is invoked to subvert justice, it is ignored by the courts". *Id*., citing *Paul v University Motor Sales Co.*, 283 Mich 587, 602; 278 NW 714 (1938). "As such, a court sitting in equity 'may look through the veil of corporate structure'—that is, pierce the corporate veil—'to avoid fraud or injustice'." *Green v. Ziegelman,* 310 Mich. App. 436, 451, 873 N.W.2d 794, 803-04 (2015) *quoting Kline v Kline*, 104 Mich App 700, 702; 305 NW2d 297 (1981). This is the right case to "look through the veil … to avoid fraud or injustice," particularly at this initial stage.

Here, Defendant Smith has been using the Smith Entities to subvert justice repeatedly and habitually. Below are just a few selected examples, among many.

**Use of Smith Entities as Alter Egos of Himself**: Smith is also routinely using his corporations as alter egos of himself.

23

The separate existence of an entity may be disregarded "...when the owners' improper domination of the entity resulted in an inequity to an innocent third party that could only be rectified by disregarding the separate existence of the entity". *Green v. Ziegelman*, 310 Mich. App. 436, 455 (2015) citing *Acton Plumbing & Heating Co v Jared Builders, Inc*., 368 Mich 626 (1962). Relevant factors that a claimant must prove may include "(1) control by the parent to such a degree that the subsidiary has become its mere instrumentality; (2) fraud or wrong by the parent through its subsidiary; and (3) unjust lost or injury to the claimant". *Gledhill v Fisher & Co*., 272 Mich 353, 357-358 (1935). However, there "...no mechanical test for determining when the existence of a separate entity must be disregarded"... and instead it "...depends on the totality of the circumstances...". *Green*, 310 Mich. App., at 457 citing *Klager v Robert Meyer Co.*, 415 Mich 402, 411-412; 329 NW2d 721 (1982) ("warning that the test is not to be applied in a 'mechanistic fashion" and stating that '[t]he entire spectrum of relevant fact forms the background for such an inquiry, and the facts are to be assessed in light of the corporation's economic justification to determine if the corporate form has been abused'.").

This case presents numerous indicators of Smith using entities as his alter egos.  Indeed, one of the entities is titled "Alter Ego Properties LLC."  A few examples include:

- *Use of the Joseph Group entity to steal Conservancy funds for no value in return.* This entity appears to be a shell that Smith simply used to receive the funds. See Hoff Decl. ¶ __. He established it in October 2012 as resident agent and sole officer. Entity was inactive between 2018 through 2022. On April 18, 2022, Smith filed a Certificate of Restoration of Good Standing, along with the delinquent Annual Reports. After April 2022, no additional documentation was filed on behalf of this entity.

- *Use of the William Smith and Associates entity to steal Conservancy funds for no value in return.* Same song, different verse. Smith established the entity in February 2001 as resident agent and sole officer. Entity entered periods of dormancy between 2001 and 2022. On October 7, 2013, and April 17, 2022, Smith submitted separate Certificates of Restoration of Good Standing forms, along with the corresponding delinquent Annual Reports. After 2022, no additional documents were filed on behalf of this entity.

- *Sole Control and Likely Ownership of Fraud Proceeds via The YBE Group, LLC-* This entity was established by William Smith on April 15, 2002. Within the Articles of Organization for this entity, Smith is identified as the resident agent and sole officer, listing 33006 Seven Mile Road, #172, Livonia, MI as the address of record. On February 28, 2023, Smith,

25

designated Geaneen Arends as the resident agent and transferred the address of record to 150 West Jefferson Ave, Suite 100, Detroit, MI. On June 6, 2024, Geaneen Arends resigned as resident agent, leaving no apparent resident agent or any other officer for this entity on record with the State of Michigan. Your affiant is aware that on or about December 5, 2014, Smith utilized The YBE Group, LLC to purchase 16551 Biltmore Street, Detroit, MI, via Quit Claim for an unspecified sum.

- *Use of "Alter Ego Properties LLC" to Give Control of a Mexican Condo to Sharah Rose* - Inquiries made through the State of Wyoming revealed that on May 16, 2020, a Domestic Limited Liability Company was established in the name of Alter Ego Properties, LLC, by Sharah Rose, who is identified as the resident agent, listing 30 North Gould Street, Sheridan, WY as the address of record. A review of subsequent Annual Reports submitted during 2022 and 2023, revealed that Sharah Rose continued to act as the resident agent for this entity. However, in the 2024 Annual Report, William Smith is identified as the officer/signer responsible for the submission of the most recent state of Wyoming filing. The Government is aware that in 2021, Smith acted on behalf of Alter Ego Properties, LLC to give power of attorney to Sharah Rose regarding a Mexico-based condominium, with an address believed to be Pedregal One

Condominiums, Unit 203, Los Cabos, Baja California Sur, Mexico.  Hoff

Aff. ¶ 25.

**Nominees of Smith himself**: Smith also uses the Smith entities as nominees.

There is no known Michigan law discussing nominee theory, so Michigan

federal courts have adopted the federal *Porta-John* six factor test to determine

whether property is held by a nominee:

> (1) Whether inadequate or no consideration was paid by the nominee;
> (2) Whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;
> (3) Whether there is a close relationship between the nominee and the transferor;
> (4) Whether they failed to record the conveyance;
> (5) Whether the transferor retains possession; and
> (6) Whether the transferor continues to enjoy the benefits of the transferred property.

*Porta-John of Am. Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998).

*See also Wilson* at *17-18; *Miller* at *6; and *United States v. DeTar*, Case No. 1:04-

CV-749, 2009 WL 2252822, at *5 (W.D. Mich. July 28, 2009).

The "nominee theory involves the determination of the true beneficial or

equitable ownership of the property" at issue. *Oxford Capital Corp. v. United States*,

211 F.3d 280, 284 (5th Cir. 2000). The nominee doctrine "stems from equitable

principles." *Richards v. United States* (*In re Richards*), 231 B.R. 571, 578 (E D. Pa.

1999). "Focusing on the relationship between the taxpayer and the property, the

27

[nominee] theory attempts to discern whether a taxpayer has engaged in a sort of legal fiction, for federal tax purposes, by placing legal title to property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *In re Richards*, 231 B.R. at 578; *accord Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) ("The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership."). *See also United States v. Patras*, 544 Fed. Appx. 137, 141 (3d Cir. 2013) ("A third party is a taxpayer's nominee where the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of [that] third party while actually retaining some or all of the benefits of true ownership.") (citations and internal quotations omitted). *Porta-John of Am. Inc. v. United States*, 4 F. Supp. 2d 688, 701 (E.D. Mich. 1998). *See also United States v. Wilson*, No. 14-13831, 2016 WL 3198629, at *17 (E.D. Mich. June 9, 2016) (applying the six factors to a property held by a family limited partnership, defendant transferred property for no consideration, close in time to a federal raid when the defendant knew he would be facing litigation and demonstrated the transferor remained in control of the partnership which held only record title and did not have income).

While courts focus on the totality of the circumstances, the most significant factor for determining nominee status is whether the taxpayer can control (either

directly or indirectly) the asset at issue. "'Virtually without exception, courts focus on the totality of the circumstances,' and no single factor is dispositive." *Fourth Inv. LP v. United States*, 720 F.3d 1058, 1070 (9th Cir. 2013) (citing *Dalton v. Comm'r*, 682 F.3d 149, 158 (1st Cir. 2012)). Rather, the overarching consideration is "whether the taxpayer exercised active or substantial control over the property." *Id*. (citations omitted).

Here, the totality of the circumstances makes it obvious that Smith is using the Smith entities as nominees for the transfer of real properties (YBE Investments LLC), and the fraud proceeds themselves in monetary form (Joseph Group, William Smith and Associates, First Round Management). Compl. ¶¶ 64.

From 2012-2024, Smith transferred over $24 million in Conservancy funds to an account controlled by the Joseph Group and Associates LLC, at Bank of America. In the same period, he also used William Smith and Associates LLC to obtain a credit card account with American Express, issuing cards to himself, his wife, and other family members, then spending Conservancy funds on personal expenses—including real property expenses—to the tune of over $14 million across 12 years. In 2016, he also made large transfers from the Joseph Group to First Round Management LLC, Hoff Aff. ¶ 10, and possibly others throughout the years.

In 2020, Smith purchased the Georgia property in his own name on

November 9, 2020, for $665,002.00, and on November 20, 2020, transferred the property by quit claim deed to YBE Investments, LLC, an entity under his control. Hoff Aff. ¶ 14.

In 2024, Smith conveyed his marital home in Redford to Ross Drive, LLC, listing his wife as the "sole member." But the LLC's address is controlled by Smith himself, the transfer was for nominal consideration, and to a close relative. He also purported to transfer 16510 Biltmore—a residential home in Detroit—to "William Smith III," for $10, and purported to transfer 16527 Biltmore to a business associate for approximately half of its value. Hoff Aff. ¶ 20.

In sum, the totality of the circumstances demonstrates that the Government has a strong likelihood of establishing that Smith's entities are alter egos of himself, have been used as nominees and for fraudulent transfers, and that their assets either contain fraud proceeds, and/or are his personal assets under Michigan law. At the very least, the Government has a high likelihood of demonstrating use of Smith's Entities as nominees by a preponderance of the evidence, thus justifying initial injunctive relief.

The scope of this Order thus properly restrains Smith's property, including assets owned via the Smith Entities, up to a total value of $39.3 million.

### D.    The Proposed Order Adopts the Proper Procedure

Pursuant to Rule 65 and the Motion and Order to Seal, the United States seeks entry of this TRO *ex parte* and under seal, with the TRO to expire in 14 days. The United States will then promptly serve the Order on financial institutions and agents controlling Smith's property and entities, followed by swift service on Smith himself (including through his criminal counsel Gerald Evelyn, if Mr. Evelyn so consents). The United States—upon service to Mr. Smith—will immediately move to unseal the entire case. The TRO itself sets a hearing for 14 days after issuance, and orders Smith and his entities to show cause, if there be any, why this Court should not enter a preliminary injunction and thereby extend the temporary order, pursuant to Rule 65 of the Federal Rules of Civil Procedure and 18 U.S.C § 1345.

This procedure tracks with the law, with due process, and adequately protects the rights of victims, the United States, Mr. Smith, and third parties.

### E.    Other Courts Have Granted Similar Relief

The Court would have good company in entering this Order. Other courts grant similar orders, upon similar facts. *Luis v. United States*, 136 S.Ct. 1083, 1088 (2015) (finding that Section 1345 "restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment," but not in other

circumstances); *United States v. Brown*, 988 F.2d 658, 663 (6th Cir. 1993)[4]; *United States v. American Therapeutic Corporation*, 797 F.Supp.2d 1289, 1293 (S.D. Fla. 2011) ("it is entirely proper for the government to enjoin not just the dissipation of the Defendants' assets traceable to the fraud but also any property of equivalent value"); *United States v. Sriram*, 147 F.Supp.2d 914, 947 (N.D. Ill. 2001); *see also United States v. Payment Processing Center*, LLC, 435 F.Supp.2d 462, 464 (E.D. Pa. 2006); *United States v. Fang*, 937 F.Supp. 1186, 1202 (D. Maryland 1996);

---

[4] Here, this case is under 18 U.S.C. § 1345(a)(2), which authorizes "equivalent value" asset freezes for banking law violations, as noted by the Supreme Court in *Luis v. United States*, 136 S.Ct. 1083, 1088 (2015); *see also United States v. DBB, Inc.*, 180 F.3d 1277, 1286 (11th Cir. 1999) (district court may freeze assets of "equivalent value" to fraud proceeds, without regard to whether the specific assets are traceable to the fraud; reversing district court determination that United States must trace any asset to be restrained to underlying fraud).

*Brown* stated that "The district court may only freeze assets that might be forfeitable to the United States in the event that fraud is established at trial" and remanded to the district court for determination of which assets were traceable to the alleged fraud. But *Brown* was a healthcare fraud case where injunctive relief was sought under 18 U.S.C. § 1345(a)(1) and (b), which does not provide for restraint of "property of equivalent value" as in 18 U.S.C. § 1345(a)(2).  After *Brown* was decided, Congress added healthcare offenses to banking law violations under Section 1345(a)(2) via the Health Insurance Portability and Accountability Act (HIPAA) of 1996, thus making "property of equivalent value" and traceable proceeds both subject to restraint in such cases.  *United States v. Fang*, 937 F.Supp. 1186, 1192-93 (D. Md. 1996) (discussing legislative history).  Thus, *Brown*'s limitation to traceable assets does not apply in this case (and would not apply in *Brown* itself if the case were brought today under the modern version of Section 1345(a)(2)).

*United States v. Petters et al*., Civil No. 08-5348 (ADM/JSM) (D. Minn.); *United States v. Barnes*, 912 F.Supp. 1187, 1198; *see also e.g. United States v. Nazzal, et al,* No. 13-mc-51028 (E.D. Mich. June 27, 2013) (Lawson, J.) (granting similar relief under the All Writs Act).

## V. Conclusion

Based upon the foregoing, the United States requests that the Court exercise its authority under 18 U.S.C. § 1345 and the All Writs Act and enter the proposed temporary order restraining the Defendant's assets up to a total value of $39.3 million for 14 days, with an order to show cause why this relief should not continue.

Respectfully submitted,

Dawn N. Ison
United States Attorney


*/s/ K. Craig Welkener*
K. Craig Welkener (DC Bar No. 1033585)
Jessica A. Nathan (TX Bar 24090291)
Assistant United States Attorneys
(313) 226-0248 (Welkener)
313-226-9643 (Nathan)
Kenton.welkener@usdoj.gov
Jessica.Nathan@usdoj.gov

Date: June 21, 2024